### ELECTRIC POWER BOARD OF CHATTANOOGA, Plaintiff,

v.

### WESTINGHOUSE ELECTRIC CORPORATION, Universal Electric Company, Wagner Electric Company, and Monsanto Company, Defendants.

No. CIV–1–87–93.

United States District Court, E.D. Tennessee, S.D.

Aug. 26, 1988.

Frederick L. Hitchcock, Chattanooga, Tenn., for plaintiff.

Thomas H. Dundon, Nashville, Tenn., for Westinghouse.

Paul R. Leitner, Chattanooga, Tenn., for Wagner Elec.

T. Maxfield Bahner, Chattanooga, Tenn., for Universal Elec.

George M. Derryberry, Chattanooga, Tenn., for Monsanto Co.

## MEMORANDUM

EDGAR, District Judge.

This is a product liability action in which the plaintiff, Electric Power Board of Chattanooga (hereinafter "EPB"), claims that the defendants manufactured and sold defective electrical equipment to the EPB and that the defective nature of the electrical equipment caused an electrical explosion and fire resulting in extensive property and related damage to the EPB. This Court has jurisdiction over the EPB claims sounding in product liability, including negligence, strict liability and breach of warranty because the parties are diverse. *See* 28 U.S.C. § 1332.

Presently before the Court are various motions of the defendants for summary judgment. Defendant Westinghouse Electric Corporation (hereinafter "Westing-house") has filed a motion for summary judgment asserting the EPB's claims based on strict liability, negligence and warranty are barred by the applicable Tennessee product liability statutes of repose and limitation, T.C.A. § 29–28–103 and § 47–2–725(2). Defendants Universal Electric Company (hereinafter "Universal") and Wagner Electric Corporation (hereinafter "Wagner") have also filed similar motions based generally on these same theories. Defendant Monsanto Company (hereinafter "Monsanto") has joined in the motion for summary judgment of its co-defendant Wagner and thereby adopts the arguments of Wagner, supplemented with its own specific arguments.

### Factual Background

On Monday, September 23, 1985, an explosion occurred in the penthouse vault atop the American National Bank Building in downtown Chattanooga, Tennessee. The explosion occurred during the time an electrical maintenance crew employed by the EPB was performing service work on EPB's "network" system located in the penthouse vault. Specifically, the equipment being serviced consisted of a "network protector" employed in the system of multiple electrical circuits making up the utility system supplying power to the large bank building. Network protectors are employed to control the flow of electrical power from multiple sources into a single electrical circuit.

The three-man EPB maintenance crew present on September 23, 1985, had monitored the operation of the network protector in the electrical penthouse vault at various times prior to the accident, and determined certain repair work was necessary, specifically, the replacement of certain parts in the network protector. Subsequent to the completion of the repair work, the crew's foreman placed the just-repaired network protector back into service and the explosion occurred. All three EPB employees on the maintenance crew were severely injured by the explosion and resulting fire, one of whom later died from his injuries. Presently pending in the Circuit Court of Hamilton County, Tennessee is the person-

al injury case of the injured and deceased crewmen arising from this accident. The suit in this Court is for property and related damages incurred by the EPB as a result of the explosion. EPB claims these defendants are liable as manufacturers for property damage resulting from the explosion because the network protector and related electrical parts identified as the cause of the explosion were defective and unreasonably dangerous when sold to it. Also a subject of this suit is EPB's claim against defendants Wagner and Monsanto that two transformers located within the vault and damaged by the explosion were defective and unreasonably dangerous as a result of their discharge of toxic dielectric fluid containing PCB's. EPB also seeks incidental damages for the costs of repair and clean-up from those defendants, as well as punitive damages against Westinghouse and its fees and costs incurred in prosecuting this suit.

### Ten–Year Statute of Limitation and Repose

Defendants collectively assert as undisputed that the EPB purchased the CM–22 Network Protector sometime in 1967, and the explosion giving rise to EPB's claims occurred in September of 1985. The EPB filed this suit on March 19, 1987—some twenty years after purchase. Defendants point out that this is well beyond the statutory period of repose which sets a maximum period of time within which claims based on theories of product liability must be brought. Therefore, defendants argue, EPB's claims arising under the Tennessee Products Liability Act are barred by T.C.A. § 29–28–103(a).[1] Specifically, that section provides, *inter alia,* that an action must be brought within ten years from the date on which the allegedly defective product was first purchased for use or consumption. T.C.A. § 29–28–103(a). As has been previously held by this Court:

> T.C.A. § 23–3703 [now T.C.A. § 29–28–103] is clearly not a conventional statute of limitation based upon the occurrence of an event giving rise to a cause of action. Instead it establishes an absolute limit of ten years from the date a product was sold for use or consumption after which all product liability actions are barred.

*Hawkins v. D & J Press Co.,* 527 F.Supp. 386, 388 (E.D.Tenn.1981) (Wilson, J.).

In its response in opposition to the defendants' argument that the statute of repose bars its claims against these defendants, EPB asserts that the statute may not bar its warranty claims, which it asserts accrued upon tender or on the date of delivery of the network protector equipment by Westinghouse in 1967. As EPB notes, this argument has been rejected by another judge of this Court in a similar case involving similar legal theories and some of the same parties pending in another division. *See Electric Power Board of Chattanooga, et al. v. Monsanto Co., et al.,* No. CIV–1–85–634, Order (E.D.Tenn. Oct. 27, 1986) (Hull, J.). In that order, the Court held: "the very broad language in Tennessee's Products Liability Act, § 29–28–102(6), suggests that it includes *all* possible legal theories which could be pleaded regarding the purchase of a defective or unreasonably dangerous product."[2] *Id.* at 2 (emphasis added). An appeal of that order is pending. The Tennessee product liability statute of repose has been consistently upheld against various constitu-

---

1. The definitional provisions of the Products Liability Act provide that a claim brought under the Act:
   shall include all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. It shall include, but not be limited to, all actions based upon the following theories: strict liability in tort; negli-
   gence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, ... misrepresentation, concealment, or nondisclosure, ... or under any other substantive legal theory in tort or contract whatsoever.
   T.C.A. § 29–28–102(6).

2. In rejecting the EPB's arguments that the statute of repose cannot constitutionally bar its causes of action, the Court relied upon *Mathis v. Eli Lilly & Co.,* 719 F.2d 134 (6th Cir.1983).

tional challenges as a proper exercise of legislative authority to statutorily limit the exposure to liability of product manufacturers and sellers. *See Kochins v. Linden-Alimak, Inc.,* 799 F.2d 1128 (6th Cir. 1986); *Mathis,* 719 F.2d 134 (6th Cir.1983); *Hawkins,* 527 F.Supp. 386 (E.D.Tenn.1981); *Wilson v. Dake Corp.,* 497 F.Supp. 1339 (E.D.Tenn.1980); *Buckner v. GAF Corp.,* 495 F.Supp. 351 (E.D.Tenn.1979); *Jones v. Five Star Engineering, Inc.,* 717 S.W.2d 882 (Tenn.1986).

The EPB argues that the statute of repose may not constitutionally bar its warranty claims because, it is asserted, those claims accrued before the 1979 date of the enactment of the statute of repose. Nevertheless, "[i]t is well settled in Tennessee that in actions for personal injury or property damage resulting from breach of warranty, the four-year statute [of limitations] provided in the Uniform Commercial Code, controls." *Tennessee Jurisprudence,* Limitation of Actions § 17 (1984) (*citing Commercial Truck & Trailer Sales, Inc. v. McCampbell,* 580 S.W.2d 765 (Tenn. 1979), and T.C.A. § 47–2–725). Subsection (2) of T.C.A. § 47–2–725 reads in pertinent part:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty [sic] explicity [sic] extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

If, as the EPB argues, its cause of action for breach of warranty against these defendant manufacturers "accrued" at tender of delivery of the network protector in 1967, the EPB is in fact barred by T.C.A. § 47–2–725(2) from bringing this action since the filing date of this lawsuit was in 1987, well beyond the four-year limitation of the statute. Clearly, the four-year statute of limitations begins to run from the date the cause of action accrued. Whether the statute of repose, T.C.A. § 29–28–103(a), may constitutionally bar

the EPB's warranty claim subsequent to its accrual has no effect upon this result.

In any event, warranty claims clearly come within the confines of the ten-year statute of repose. Although EPB asserts that its warranty claims are beyond the reach of that statute, the Court agrees with the analysis of Judge Hull in the previously cited order. The plain language of the Tennessee Products Liability Act defines a "product liability action" to include a breach of warranty cause of action. Just as clearly, T.C.A. § 29–28–103(a) places a time limitation on the filing of *"[a]ny action* against a manufacturer or seller of a product...." (Emphasis added). T.C.A. § 29–28–103(a) also clearly refers to the four-year period of limitation otherwise applicable to warranty claims under § 47–2–725, but then proceeds to create the statutory period of repose. As previously noted, the application of this statute has withstood constitutional challenge on similar grounds in this Court, the Tennessee courts and the U.S. Circuit Court of Appeals. *See Wayne v. Tennessee Valley Authority,* 730 F.2d 392 (5th Cir.1984). The Court finds the statute of repose was intended by the Tennessee Legislature to apply to breach of warranty claims despite their accrual at tender of delivery.

■ With regard to the remainder of EPB's claims arising under the Tennessee products liability law, defendants collectively assert that the ten-year period of repose bars EPB's suit. Claims based on strict liability, negligence, warranty or "any other substantive legal theory in tort or contract whatsoever" are subject to the statutory limitations prescribed in T.C.A. § 29–28–103(a). However, the EPB argues that the defendants should be equitably estopped from relying upon the statute of repose to bar its claims. The EPB primarily cites two cases in support of its equitable estoppel theory. *Bomba v. W.L. Belvidere, Inc.,* 579 F.2d 1067 (7th Cir. 1978) and *Cange v. Stotler & Co., Inc.,* 826 F.2d 581 (7th Cir.1987). The Sixth Circuit has applied the theory of equitable estoppel as set forth in *Glus v. Brooklyn Eastern*

*Dist. Terminal,* 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959) to ensure "that no man may take advantage of his own wrong." *Id.* at 232, 79 S.Ct. at 762. In *Ott v. Midland–Ross Corp.,* 600 F.2d 24 (6th Cir.1979), the Court found that:

[i]f the defendant made a misrepresentation of material fact for the purpose of inducing a plaintiff to delay suit or release him from liability, it is estopped to plead the statute of limitations or to interpose the release as a bar to suit, provided the plaintiff has acted in justifiable reliance upon the misrepresentation.

*Ott* at 31.

The Court has considered the case law cited by the EPB, in light of the allegations it makes that Westinghouse "knew" of the defective and dangerous nature of the network protector but failed to correct or warn of the defect or dangers alleged. "Equitable estoppel arises where the parties recognize the basis for suit, but the wrongdoer prevails upon the other to forgo enforcing his right until the statutory time has lapsed." *Aldrich v. McCulloch Prop. Inc.,* 627 F.2d 1036, 1043 n. 7 (10th Cir. 1980). The Court finds that EPB's allegations in support of its claim for punitive damages are not sufficient to support a claim for estoppel against Westinghouse. EPB has failed to allege or factually support a claim that Westinghouse made any type of "misrepresentation of material fact for the purpose of inducing" the EPB to forego filing the instant suit. The Court finds no evidence to suggest that Westinghouse has in any way admitted its liability for the accident giving rise to this suit. Nor has evidence been offered to suggest that Westinghouse attempted to affect the time of filing of the instant lawsuit. The Court does not believe that the EPB's assertions in its complaint or the evidence from depositions offered in support of this theory establish the necessary affirmative misrepresentation with the intent to induce reliance on the promise anticipated by courts applying the doctrine of equitable estoppel under similar circumstances. *See, e.g., Cange,* 826 F.2d at 587–88; *Curry v. A.H. Robbins Co.,* 775 F.2d 212, 218–19 (7th Cir.1985); *Cook v. Deltona Corp.,* 753 F.2d 1552, 1562–63 (11th Cir.1985); *Aldrich,* 627 F.2d at 1043, *Ott,* 600 F.2d at 31–32; *Bomba,* 579 F.2d at 1070–71.

In Tennessee,

[a] cause of action accrues when a suit may be maintained upon it. Black's Law Dictionary 37 (4th ed. 1951). A suit may not be brought upon a cause of action until it exists, and a cause of action does not exist until all its elements coalesce. In civil actions for damages, two elements must coalesce before a cause of action can exist: (1) a breach of some legally recognized duty owed by the defendant to the plaintiff; (b) which causes the plaintiff some legally cognizable damage.

*Hodge v. Service Machine Co.,* 438 F.2d 347, 349 (6th Cir.1971). Stated alternatively, "[u]nder the law of Tennessee, a cause of action accrues when the plaintiff suffers in actuality a legally-cognizable wrong and thus acquires a right to bring suit for redress." *Windsor v. A Federal Executive Agency,* 614 F.Supp. 1255, 1262 (M.D.Tenn. 1983). With respect to the EPB's claims of strict liability, negligence and failure to warn, T.C.A. § 28–3–105 provides that a cause of action for injury to property "shall be commenced within three (3) years from the accruing of the cause of action...." In this case, the EPB's cause of action accrued on the date of the explosion, that being the date that all of the necessary elements of accrual set forth in *Hodge* coalesced. However, this date, September 23, 1985, is more than ten years beyond the date on which the original network protector and related equipment were "first purchased for use or consumption," in 1967. T.C.A. § 29–28–103(a). The EPB's causes of action as they relate to the network protector purchased by the EPB in 1967 for negligence and strict liability did not accrue within the applicable statutory period of repose, and are therefore barred by T.C.A. § 29–28–103(a). *See Wayne v. Tennessee Valley Authority,* 730 F.2d 392 (5th Cir. 1984).

EPB's warranty causes of action as to the network protector are also barred by

both T.C.A. § 29–28–103(a) and T.C.A. § 47–2–725.

## Punitive Damages

■ In this case, the EPB seeks recovery of punitive damages from defendant. In its motion for summary judgment, Westinghouse argues that as a matter of law, EPB is not entitled to such a recovery. Westinghouse argues that the EPB has failed to sufficiently allege the necessary factual predicate acts of malice, fraud or willfulness with regard to its claims, and that the EPB's allegation that Westinghouse knew of the defective and unreasonably dangerous nature of the network protector and component parts is insufficient, even if proven, to support an award of punitive damages.

> Punitive damages are allowed under Tennessee law and are given in excess of, and in addition to, compensatory damages. They are awarded in cases involving fraud, malice, gross negligence, or oppression, ... or where a wrongful act is done with a bad motive or recklessly as to imply a disregard of social obligation, ... or where there is such willful misconduct as to raise a presumption of conscious indifference.

*Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1216 (6th Cir.1988) (citations omitted). *See also Inland Container Corp. v. March*, 529 S.W.2d 43 (Tenn.1975).

In its motion for summary judgment, Westinghouse argues that there is "the absence of a genuine issue of material fact" as to the necessary underlying actions of Westinghouse required to support an award of punitive damages. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once a sufficient showing has been made to raise the issue by the movant, the non-moving party must respond by setting forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This burden has not been satisfied by the EPB with regard to punitive damages.

The only allegations offered by EPB in support of its claim for punitive damages, and in response to Westinghouse's motion, are that Westinghouse "knew" that the network protector, SG relay and closing motor were defective, but failed to take steps to correct the defect or warn its customers. The only evidence offered by the EPB in support of this claim is isolated excerpts from deposition testimony wherein Westinghouse engineers described these component parts as generally expendable, or implied that Westinghouse knew or "possibly knew" of potential failures of these component parts. The Court finds these citations inadequate as a matter of law to satisfy EPB's burden under either the appropriate summary judgment standards or the standards previously noted for an award of punitive damages. Westinghouse's motion for summary judgment with respect to EPB's claim for punitive damages will be GRANTED.

## Component Parts

Defendants Westinghouse and Universal are alleged to have supplied replacement or repair parts for the network protector that exploded. Included in the EPB's complaint are numerous references and allegations concerning the "SG relay" and "network protector closing motor" and their contribution to the explosion. The EPB alleges that Westinghouse designed and manufactured the SG relay and partially designed the closing motor, both alleged to be defective. Universal is alleged to have designed and manufactured the closing motor that EPB purchased from Westinghouse as a replacement part. Specifically, Westinghouse asserts that the ten-year statute of repose bars EPB's claims that these component parts were defective and unreasonably dangerous, where the EPB asserts that the components were defective only as used and applied in the network protector. Westinghouse and Universal both assert that because EPB's complaint fails to allege that the individual component parts were defective standing alone, they cannot be liable for supplying replacement component parts assembled in a later product that may itself be defective. *See Kellar v.*

*Inductotherm Corp.*, 498 F.Supp. 172, 175 (E.D.Tenn.1978); *Restatement (Second) of Torts* § 402A, comment (q).

In response, the EPB states that it does allege that the individual component parts were themselves defective in design. EPB cites to several paragraphs of its complaint that it asserts state claims alleging the defective and dangerous design of both the closing motor and SG relay. Also, in opposition to the defendants' motions relating to the component parts, EPB offers the affidavits and deposition testimony of its employee and engineer, Ron Fugatt, which EPB asserts establishes that it does allege that the component parts are themselves defective. For purposes of this motion, the Court agrees that the EPB has sufficiently stated a claim that the identified component parts are themselves defective to withstand summary judgment on this issue. However, the Court notes it will ultimately be for a jury to determine if the components were themselves defective and dangerous and whether their alleged defect caused the injury, only after considering the proof and the applicable law.

### The Westinghouse SG Relay

■ Westinghouse argues that the EPB is unable to determine the exact date of purchase of the allegedly defective SG relay, therefore, EPB cannot conclusively show that its claims are not barred by both the applicable statutes of limitation and statute of repose. It is the replacement SG relay asserted to have been used to repair the network protector just before it exploded which EPB claims was defective. The affidavit of Ron Fugatt establishes, for purposes of summary judgment, that the SG relay was in fact purchased within ten years of the date of the accident (September 23, 1985) and the filing of this case (March 19, 1987).

With respect to EPB's warranty claims on the SG relay, Westinghouse argues that because EPB cannot establish the purchase date of the particular SG relay alleged to have caused the explosion, its warranty claim should be dismissed. T.C.A. § 47–2–725 requires that any warranty ac-

tion be filed within four years of tender or delivery of the product. Therefore, EPB is required to show that this particular SG relay was purchased sometime after March 19, 1983. In response to Westinghouse's claim as to warranty, the EPB argues only that there is an issue of fact relevant to tolling of the warranty statute of limitations. This argument relies upon EPB's claim that Westinghouse somehow "fraudulently concealed" EPB's cause of action. The Court has previously considered this argument and finds that it is without merit and unsupported by the record and facts of this case. While Mr. Fugatt can say that the SG relay was purchased within ten years of the filing date and withstand summary judgment on the repose issue, his deposition testimony indicates that EPB cannot establish that its warranty claim with regard to the SG relay was filed within four years of tender or purchase. *See* Deposition of Ronald Fugatt, April 29, 1987, at 83–86. As the EPB has failed to support its claim that there exists a genuine issue of material fact as to the timeliness of its warranty claim relating to the SG relay, that claim will fall to Westinghouse's motion for summary judgment. This determination will not affect the EPB's claims against Westinghouse for property damage controlled by T.C.A. § 28–3–105 based on negligence or strict liability.

### The Universal Motor

■ Universal states that it did not manufacture or sell closing motors for use on the Westinghouse network protectors until 1977. It, therefore, admits that if the motor on the network protector alleged by EPB to be defective, dangerous and the cause of the explosion was in fact manufactured by Universal, the ten-year statute of repose will not bar the EPB's claims against it. There appears, however, to be a genuine issue of material fact as to identity of the manufacturer of the closing motor. Hence, Universal's summary judgment motion must be denied insofar as it seeks dismissal of this action on the basis of the ten-year statute of repose.

In further support of its motion, Universal asserts that the EPB is barred by the applicable statutes of limitation unless it can conclusively prove that suit was filed within the specific time periods allowed by statute. Specifically, EPB warranty claims must have been filed within four years of "tender of delivery" (T.C.A. § 47–2–725), and its property damage claims within three years of the accrual of the cause of action (T.C.A. § 28–3–105). In this regard, Universal asserts that the EPB cannot prove the purchase date or date of tender of the motor alleged to have caused this particular accident because the EPB's stock records and system of parts restocking do not provide such evidence. It is alleged that the EPB can only show that a certain number of replacement motors were purchased from Westinghouse since 1977 that would also have been manufactured by Universal. Those purchases were made in the years 1977, 1979, 1982 and 1984. However, Universal alleges EPB cannot prove that the particular motor installed on the network protector that exploded was purchased by EPB within four years of the date of this suit.

█ In response, the EPB asserts that there is a genuine issue of material fact as to the manufacture of the specific motor, and that sufficient evidence has been adduced to establish that the particular motor could have been purchased within four years of the filing of this suit, thereby satisfying the requirements of T.C.A. § 29–28–103(a) and the applicable warranty statute of limitation. The Court finds that EPB has produced sufficient proof on this issue to withstand Universal's motion for summary judgment. EPB should be allowed to have a jury determine the factual issues relevant to the purchase of the closing motor. However, the Court would point out that the plaintiff will have the burden of proof at trial to show that neither the four-year statute of limitations nor the statute of repose bars its property damage and warranty claims against Universal, since it seeks to avoid the defendants' assertion of the affirmative defense. *See McFarland v. Athletic House Marine, Inc.,* 489 F.Supp. 53 (E.D.Tenn.1980); *Ak-*

*ron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230, 234 (6th Cir.), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974).

Universal's motion also seeks summary judgment on the theory that it cannot be held liable for the allegedly defective design and manufacture of the closing motor sold exclusively to Westinghouse for use in Westinghouse's network protectors. Universal supports this argument by pointing out that it developed and manufactured the closing motors sold to Westinghouse like that in the instant network protector based entirely on specifications and models provided it by Westinghouse. Universal cites the Court to case law it asserts holds "that where a component manufacturer makes his product according to the information, specifications, or designs supplied by the purchaser of the component part, the component manufacturer cannot be found strictly liable for design defects in the component part." Further, Universal notes that the deposition testimony of Messrs. Bruderly and Cole establishes that Westinghouse did not rely upon any Universal design to determine the suitability of the Universal motor for its application by Westinghouse.

In opposition to this claim, EPB asserts that Universal was not merely a passive manufacturer of the motor in question, but that Universal designed and built the closing motor using Westinghouse specifications and models, together with extensive knowledge of the intended application of the motors. In addition, EPB points to at least two internal documents—the "Universal Company Elementary Manual" and the "Product Safety and Reliability Responsibilities Statement"—which indicate the extensive degree of involvement Universal had in developing this particular closing motor. Specifically, the EPB argues that there is sufficient evidence that Universal actively participated in, or at least should have actively participated in, evaluating the specifications in the "sample motor request" and the intended application of the closing motor, where certain proposed changes suggested by either Universal or

Westinghouse to the other were rejected. The EPB also points out that Tennessee products liability law holds a component manufacturer strictly liable for the harm done by a product defectively designed, where the product is not safe for its intended and reasonably foreseeable use. *See Ellithorpe v. Ford Motor Co.*, 503 S.W.2d 516, 519 (Tenn.1973). In effect, the EPB argues that Universal cannot escape liability by hiding behind its claim that it only built the closing motor according to Westinghouse specifications, in light of evidence indicating that it knew of the intended applications, and arguably, of the foreseeable dangers of the design. The Court, for purposes of this summary judgment motion, agrees. The Court finds that the EPB has highlighted a genuine issue of material fact regarding Universal's involvement in the design and manufacture of the allegedly defective closing motor, where it was being used for its intended purpose, but failed to operate properly. Therefore, the jury must be allowed to determine the existence and extent of Universal's liability for the allegedly defective design of the closing motor.

### Motions for Summary Judgment of Defendants Wagner Electric Company and Monsanto Company

Defendant Wagner has filed a summary judgment motion in which it argues that the EPB's claims against it are barred by T.C.A. §§ 29–28–103(a) and 47–2–725. Alternatively, Wagner argues that as a matter of law, EPB has failed to establish a causal link between its allegedly defective product and the property damage for which EPB seeks to recover. Defendant Monsanto has joined in Wagner's motion, relying upon and supplementing the arguments of Wagner.

Wagner manufactured and sold electrical transformers to the EPB, seven of which were located and operating in the electrical penthouse vault of the American National Bank Building at the time of the 1985 explosion. Those transformers were purchased and placed in use by the EPB during 1967. While the two transformers at issue in this case are generally agreed not to have caused the electrical explosion and

ensuing fire, they are alleged by the EPB to have caused serious property and environmental damage to the penthouse vault and bank building, requiring extensive expenditures for testing and clean-up. More precisely, the EPB alleges that Wagner and Monsanto are liable for the damage caused by the leaking of dielectric cooling fluid containing PCB (polychlorinated biphenyl) contaminants from the physically damaged transformers. The parties are in agreement that the transformers leaked PCB-laden dielectric fluid only after being struck by exploding or burning electrical equipment otherwise involved in the network protector explosion. The EPB does not, however, allege that any defect in the transformers contributed to the initial electrical explosion. The parties have stipulated that the defendant Monsanto was the only source from which Wagner purchased PCB's for use in its dielectric fluid contained in the transformers sold to EPB in 1967. The parties do not agree on the quantity of dielectric fluid released by the damaged transformers, however, the Court notes that the EPB has offered photographs depicting the leak complained of, and the defendants do acknowledge that a release of dielectric fluid did occur.

The EPB asserts that this PCB-laden dielectric fluid was tracked about the penthouse and bank building by firemen responding to the penthouse fire and that an "extremely small" amount of the fluid "vaporized and spread by air currents and smoke to portions of the ANB Building outside the vault." This alleged contamination resulted in the necessary expenditures for toxic clean-up and testing sought by EPB from these defendants. The defendants deny that the leaked dielectric fluid combusted or vaporized in the fire, and deny that PCB contamination occurred to the degree alleged by the EPB.

The EPB, in its complaint, asserts claims against Wagner for negligence, strict liability, and implied warranty arising from its use of the toxic dielectric fluid containing PCB's. The EPB asserts that the transformers were defective and unreasonably dangerous when designed with the toxic

coolant. EPB alleges the same causes of action against Monsanto as the manufacturer of the toxic PCB fluid.

Wagner has raised as a ground for summary judgment that the Tennessee ten-year statute of repose would apply to EPB's claims against Wagner based on its allegations that the transformers and dielectric fluid therein were defective and unreasonably dangerous. The statute would bar all of EPB's claims arising from products sold before ten years from the filing of this suit. Likewise, the Court's analysis regarding the applicability of the four-year warranty statute of limitations found in T.C.A. § 47–2–725(1) would apply to EPB's warranty claim against these defendants. Clearly, the EPB has acknowledged that the "tender of delivery" date of the transformers was during 1967.

■ However, the EPB argues in opposition to Wagner's position that the state statutes of repose and limitation are preempted or superseded by recent federal legislation. EPB asserts that 42 U.S.C. § 9658 tolls the state law statutes of limitation and repose, substituting therefor a discovery statute of limitations for toxic tort actions brought in state courts. Section 9658 was one of the 1986 amendments to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* Specifically, 42 U.S.C. § 9658 provides *inter alia* that in state law causes of action for personal injury or property damage arising from exposure to any hazardous substance or contaminant released into the environment from a facility, where the applicable state statute of limitations provides a commencement date that is earlier than the federally required commencement date, the later federal date controls. The statute defines "commencement date" as "the date specified in a statute of limitations as the beginning of the applicable limitations period." 42 U.S.C. § 9658(b)(3). The "federally required commencement date" is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages ... were caused ... by the hazardous

substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A).

Other courts faced with the argument that section 9658 preempts otherwise applicable state limitations periods in personal injury or property damage suits arising under state law have looked primarily to the language of the federal statute to determine if Congress intended section 9658 to create a federal discovery statute of limitations in all toxic tort cases. These courts have focused on three critical factors that must be present in the state law personal injury or property damage claims before those claims can be affected by the federal statute. These are: (1) whether the damage was "caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant" (2) "released into the environment" (3) "from a facility." *See* section 9658(a)(1). As the EPB points out, PCB's have been specifically banned from future use in electrical transformers pursuant to 40 C.F.R. Part 761, and they are generally prohibited by the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.* The Court is satisfied that the first factor is satisfied.

Section 9601(22) defines "release" as "any spilling, leaking, ... emitting, ... discharging, ... escaping, ... into the environment,...." The definition also lists certain exceptions not here relevant. Section 9601(8) defines "environment" as:

... (A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson Fishery Conservation and Management Act [16 U.S.C.A. § 1801 *et seq.*], and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States;....

Section 9601(9) defines "facility" as:

... (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond,

lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, store, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel;....

It is the application of these statutory definitions to the facts in this case which will determine if the federal statute applies.

In this case, EPB has submitted evidence that PCB's were leaked or released into the penthouse vault and subsequently tracked about the general area by persons extinguishing the fire. EPB also asserts that there is sufficient evidence of combustion and vaporization of PCB's to indicate they became airborne. The defendants challenge this conclusion and point to the EPB's own witnesses that generally denied that a dangerous quantity of PCB's were combusted in the fire. The Court notes that section 9658 requires that the hazardous release be from a "facility" into the "environment." However, the definition of "facility" specifically excludes "any consumer product in consumer use or any vessel;" from the scope of the definition, and presumably the CERCLA. Although several courts have leaned toward an expansive definition of "facility," *see, e.g., Knox v. AC & S, Inc.,* 690 F.Supp. 752 (S.D.Ind., 1988); *United States v. Bliss,* 667 F.Supp. 1298, 1305 (E.D.Mo.1987); *State v. General Electric Co.,* 592 F.Supp. 291, 295 (N.D.N.Y.1984), this clear statutory language excludes "any consumer product in consumer use" from the scope of this statute. The Court believes that the Wagner transformers containing Monsanto dielectric fluid are consumer products in consumer use. The transformers were not, therefore, "facilities."

■ Within the Act's definition of "environment" is included "ambient air." Under the facts of this case, the evidence shows that the dielectric fluid leaked on the floor of the penthouse vault and was tracked

about on the upper floors of the building. The parties disagree as to the severity of the actual contamination within the bank building. EPB specifically relies upon photographs showing smoke pouring from the top floors of the bank building into the atmosphere to support its claim that PCB's were released into the environment. The Court believes, however, that since the injury for which the EPB seeks recovery results from expenses incurred in cleaning and testing *inside* the building, it cannot rely on any release of PCB's outside the building in order to come within the CERCLA. There is no causal link between EPB's injury and any potential release outside the confines of the building. Therefore, EPB could maintain no cause of action on such a claim.

As the *Knox* court just recently held, although the definition of "environment" may include "ambient air," its intended meaning must be discerned "in terms of the overall purpose and scope of CERCLA...." *Knox,* 690 F.Supp. at 757. To discern the scope of CERCLA, courts have turned to the reports, recommendations and amendments that have come from the congressional study group charged with the responsibility for oversight under CERCLA. It is clear from the committee report cited in *Knox* [3] that the scope of CERCLA is limited to the release of hazardous substances in "waste" form only, noting that the enforcement provisions of the CERCLA do not apply to non-waste releases. *See Knox* at 757. The report continues:

[t]he emphasis of this report, similar to the emphasis of CERCLA, is on remedying the adverse consequences of improper disposal, improper transportation, spills, and improperly maintained or closed disposal sites.... [T]he remedies discussed in this report are legal remedies for personal injury, environmental damages and reduction of property value resulting from the spills of hazardous substances and disposal of hazardous

---

**3.** The Court would point out that Chief Judge Hull of this Court also relied upon the report of the Section 301 Study Group in his orders

considering and subsequently dismissing EPB's claims under CERCLA in *Electric Power Board v. Monsanto,* No. CIV–1–85–634.

wastes for which CERCLA provides cleanup and remedial activities. *See Knox* at 757.

■ This Court does not believe that the leaking of a relatively small quantity of dielectric fluid from a damaged transformer, within the confines of a penthouse containing electrical equipment, is the type of "release into the environment contemplated or intended by the CERCLA. The dielectric fluid was not released as waste, but accidentally, from a properly operating electric transformer. In addition, it is obvious from merely reading 42 U.S.C. §§ 9601 *et seq.* that the focus of the statute is to create a national law and remedy in response to the crisis created by the unlawful and unregulated disposal of hazardous and toxic wastes. CERCLA seeks to provide funds for toxic clean-up and enforcement of federal and state laws regarding such disposal activities, but only where there is also an underlying cause of action under CERCLA. *See Knox* at 757. In this case, the EPB has asserted no cause of action under this Act, but seeks only to have the benefit of one of its provisions to avoid the Tennessee statute of repose. Principles of statutory construction compel this Court to consider EPB's argument in light of the underlying purpose and intent of the statute. *See* C. Sands, *Sutherland Statutory Construction* § 46.05 (4th ed.) (cited in *Knox,* at 757). For these reasons, the Court declines to hold that 42 U.S.C. § 9658 alters the statutory time limitations set forth under Tennessee law for filing property damage suits such as this. The EPB's claims against Wagner and Monsanto are, therefore, barred by the ten-year statute of repose. T.C.A. § 29–28–103(a).

An appropriate order will enter.

### ORDER

Pursuant to the accompany memorandum it is hereby ORDERED:

(1) The motion of defendant Wagner Electric Company for summary judgment is GRANTED, and this case is DISMISSED as to this defendant.

(2) The motion of defendant Monsanto Company for summary judgment is GRANTED, and this case is DISMISSED as to this defendant.

(3) The motion of defendant Westinghouse Corporation for summary judgment is GRANTED IN PART, DENIED IN PART. The motion is GRANTED as to:

(a) the plaintiff's claims of defective and unreasonably dangerous design and manufacture, negligence, strict liability and warranty relating to the original network protector and any original component parts;

(b) the plaintiff's claims that Westinghouse breached any warranty covering the replacement SG relay; and

(c) the plaintiff's claim for the recovery of punitive damages.

Said motion is DENIED in all other respects.

(4) The motion of defendant Universal Electric Company for summary judgment is DENIED.