**VERNON VILLAGE, INC., on behalf of itself and others similarly situated**

v.

**Warren J. GOTTIER and Precision Plating Corp.**

**Marion DECESAR**

v.

**George VAN OSTRAND, High Manor, Inc., and Leisure Living, Inc.**

Civ. Nos. H–88–48 (JAC), H–89–667 (JAC).

United States District Court, D. Connecticut.

Dec. 18, 1990.

---

John L. Giulietti, Vernon, Conn., for plaintiffs.

Suzanne M. Batchelor, Tarlow, Levy, Harding & Droney, Farmington, Conn., for defendants George Van Ostrand, High Manor, Inc. and Leisure Living, Inc.

RULING ON PENDING MOTIONS

JOSÉ A. CABRANES, District Judge:

## CONTENTS

I. INTRODUCTION ........................................... 1145
II. BACKGROUND ........................................... 1145
III. DISCUSSION ........................................... 1146
    A. Plaintiff's Motion for Partial Summary Judgment (SDWA Count) ... 1146
    B. Defendants' Cross–Motion for Summary Judgment ... 1148
        1. CERCLA (Count 1) ... 1148

a. Is Plaintiff's Claim Barred by res judicata? 1148
b. Does CERCLA Apply to Defendants? 1149
2. SDWA (Count 5) 1151
3. RCRA (Count 6) 1153
a. Can Plaintiff Simultaneously Bring Claims Under RCRA and under SDWA? 1153
b. Does RCRA Apply to Defendants? 1154
1. Are Defendants Subject to RCRA Permit Requirements? 1154
2. Do the Levels of Chromium Represent an "Imminent and Substantial Endangerment to Health or the Environment"? 1154
4. Pendent State Law Claims (Counts 2–4) 1155
a. Private Nuisance 1155
b. Public Nuisance 1156
c. Battery 1156
C. Motion to Reopen Discovery 1156
IV. CONCLUSION 1156

## I. INTRODUCTION

The pending motions arise in one of the *Vernon Village* cases, which involve claims that the various defendants were responsible for damage resulting from the release of certain chromium chemicals into the water supply of a trailer park. Pending before the court are three motions in the case of *Marion Decesar v. George Van Ostrand, et al.*, Civil Action No. H–88–667 (JAC), consolidated with Civil Action No. H–88–48 (JAC): Plaintiff's Motion for Partial Summary Judgment and Other Relief (filed May 30, 1990); Defendants' Cross–Motion for Summary Judgment (filed Aug. 10, 1990); and Plaintiff's Motion to Reopen Discovery for a Limited Purpose in H–89–667 (JAC), and to Assess Costs Against Defendants (filed Sept. 12, 1990).

## II. BACKGROUND

During the summer of 1979, the Department of Health Services ("DHS") and the Department of Environmental Protection ("DEP") of the State of Connecticut discovered chromium contamination of the soil and groundwater at Precision Plating Corporation ("Precision"), located in Hillside Industrial Park in Vernon, Connecticut. The industrial park is owned by Warren Gottier, the defendant in Civil Action No. H–88–668 (JAC) action and, along with Precision, in Civil Action No. H–88–48 (JAC). In 1986, DEP ordered both Precision and Mr. Gottier to investigate and remedy the groundwater, surface water and soil contamination resulting from Precision's storage, handling, and disposal activities. In addition, the Connecticut Commissioner of Environmental Protection ("Commissioner") ordered Precision and Gottier to provide a potable drinking water supply to neighboring properties.

Both Vernon Village, Inc. ("Vernon Village") and High Manor, Inc. ("High Manor") own trailer parks that border the Hillside Industrial Park ("Hillside"). High Manor owns and operates a system of wells and pipes to supply drinking water to the residents of High Manor Mobile Home Park ("Park"). Plaintiff Marion Decesar is a resident of the Park which is owned and operated by High Manor. The Park lies "downhill" from Hillside, so when the contaminants were released, they polluted the Park's drinking water supply. In 1985, one of High Manor's wells—Well # 1—was taken out of service due to chromium contamination. Contaminants found in another well—Well # 5—led High Manor to blend the water from that well together with that from two other wells so as to dilute the concentration of contaminants. In 1986, the Commissioner required Precision and Mr. Gottier to provide an alternative drinking water supply to residents of the Park.

In 1988, plaintiff Marion Decesar joined Vernon Village and others in a class action against both Mr. Gottier and Precision alleging violations of the Comprehensive

Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9657 (1988) ("CERCLA"). On September 7, 1989, I entered an order approving the settlement of the class action claims which required Mr. Gottier and Precision to pay for an extension of the public water mains of the Connecticut Water Company to the Park and to pay $2,000 as reimbursement to class members for their purchases of bottled water. *See* Order Regarding Motion for Class Action Settlement (filed Sept. 7, 1989). As part of her pro rata share of the $2,000, plaintiff Marion Decesar received $188.94. *See* Defendants' Corrected Memorandum of Law in Support of Cross–Motion for Summary Judgment (filed Sept. 20, 1990) ("Defendants' Memorandum"), Exhibit 16 (Plaintiff Marion Decesar's Responses to Defendants' Request for Admission in H–89–667 (JAC) (July 6, 1990)), ¶ 5. According to Mr. Gottier's attorney, the public water from the Connecticut Water Company became the sole supply for the residents at the Park on January 22, 1990. *See* Defendant's Memorandum, Exhibit 13 (Letter from Attorney Joel M. Fain to Judge José A. Cabranes (Jan. 24, 1990)).

On October 16, 1989, plaintiff Marion Decesar filed suit against defendants George Van Ostrand, Leisure Living, Inc. and High Manor for failing to monitor the Park's public water supply. Mr. Van Ostrand is the president of High Manor and of Leisure Living, Inc., both of which were owners of the Park at different periods during the 1980's. In her six-count complaint, Ms. Decesar alleges violations of CERCLA (Count 1); the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j–10 (1988) ("SDWA") (Count 5); the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6992k (1988) ("RCRA") (Count 6); and pendent state law claims of private nuisance (Count 2), public nuisance (Count 3), and battery (Count 4).

Plaintiff has moved for partial summary judgment on Count 5—the SDWA count—claiming that there are no genuine issues of material fact remaining to be tried with respect to defendants' operation of the public water supply. Defendants have cross-moved for summary judgment on all six counts of plaintiff's complaint. Finally, plaintiff has moved to reopen discovery for the limited purpose of permitting counsel to discover—through deposition testimony as well as subpoena—the circumstances surrounding a certain letter, *see* Defendants' Memorandum, Exhibit 15 (Letter dated July 12, 1990 from Jerome J. Healey, Chief, Groundwater Management and Water Supply Branch of Region I of the U.S. Environmental Protection Agency ("EPA") to Paul Ritsick, Principal Sanitary Engineer of DHS' Water Supplies Section) ("Exhibit 15") concerning the compliance status of the Park.

### III. DISCUSSION

I shall consider the pending motions in the following order: First, plaintiff's motion for partial summary judgment; second, defendants' cross-motion for summary judgment; and finally, plaintiff's motion to reopen discovery for a limited purpose.

### A. *Plaintiff's Motion for Partial Summary Judgment (SDWA Count)*

■ Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire In-*

*surance Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Finally, mere conclusory allegations and denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

■ Count 5 of plaintiff's complaint alleges that defendants violated SDWA in failing properly to test the level of certain contaminants; permitting the total levels of chromium and radionuclides in the drinking water to exceed the maximum contaminant levels prescribed by regulation; and failing to give the residents of the Park adequate notice of the high levels of contamination.

Under applicable federal regulations, an "owner or operator of a public water system which fails to comply with an applicable MCL [maximum contaminant level] or treatment technique established by this part or which fails to comply with the requirements of any schedule prescribed pursuant to a variance or exemption, shall notify persons served by the system...." 40 C.F.R. § 141.32(a) (1990). Whether or not the amount of radionuclides and/or chromium in the drinking water exceeded the maximum contaminant levels is a material issue of fact, because there is a duty to notify only when the level of contaminants exceeds the maximum permitted.

Defendants argue that it is the state that decides when and whether there has been a violation of maximum contaminant levels. Under 40 C.F.R. § 141.23(4) (1990), "[t]he State has the authority to determine compliance or initiate enforcement action based upon analytical results and other information compiled by their sanctioned representatives and agencies." It is not disputed, as argued in Defendants' Memorandum at 20 and supported by deposition testimony and other exhibits, that both the federal EPA and the state DHS have indeed determined that no violations of the maximum contaminant levels have occurred for either chromium or for natural radionuclides. *See* Defendants' Memorandum at 20 & n. 5 ("In the case of the water supplied to the Park both the state and federal governments have made the determination that no violations have occurred for either chromium or radionuclides.").

According to the citizen's suit provision of SDWA, "any person may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation of any requirement prescribed by or under this subchapter...." 42 U.S.C. § 300j–8(a)(1) (1988). The Supreme Court has interpreted the identical "alleged to be in violation" language in the context of the Clean Water Act, 33 U.S.C. §§ 1251–1376, § 1365(a)(1), to mean "that citizens, unlike the Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate *an ongoing violation.*" *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 59, 108 S.Ct. 376, 382, 98 L.Ed.2d 306 (1987) (emphasis added).[1]

Even assuming for the argument that, in a citizen's suit, the state's determination of compliance is not dispositive, there is sufficient confusion in the record about the precise level of contamination in the wells at the time this lawsuit was commenced to raise a genuine issue of material fact, thereby precluding the granting of summa-

---

1. Plaintiff asserts in her memorandum that *Gwaltney* stands for the proposition that all that is required to recover under the citizen's suit provision of the Clean Water Act (and, by analogy, of SDWA) is that plaintiff have a "good-faith belief when she signed and filed her complaint on October 16, 1989" that defendants were in violation of SDWA. *See* Memorandum in Support of Plaintiff Marion Decesar's Motion for Partial Summary Judgment and Other Relief (filed May 30, 1990) ("Plaintiff's Memorandum") at 13. I cannot agree. The Supreme Court's holding in *Gwaltney*—that a district court has jurisdiction when there is "a good-faith allegation of ongoing violation," *Gwaltney,* 484 U.S. at 67, 108 S.Ct. at 386—does *not* mean that a "good-faith allegation" of ongoing violations is sufficient to win on the merits. Even assuming that plaintiff's allegations were made in good faith, that fact alone would only entitle plaintiff to *survive* a motion to dismiss, Fed.R.Civ.P. 12(b)(6); it would not entitle her to *prevail* on a motion for summary judgment, Fed R.Civ.P. 56(c).

ry judgment. Plaintiff asserts that "[s]hould the defendants fail to produce any test results for which they were required to obtain [sic], that failure should lead to an 'adverse inference.'" Plaintiff's Memorandum at 14 (quoting *International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329, 1339 (D.C.Cir.1972)). Plaintiff has failed to appreciate, however, that hers is a motion for summary judgment. As Judge J. Skelly Wright observed in the very case on which plaintiff purports to rely, "if a party has good reason to believe his opponent has failed to meet his burden of proof, he may find no need to introduce his strong evidence." *International Union*, 459 F.2d at 1338. In a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences favorable to the party against whom summary judgment is sought, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), and it is the moving party that has the burden of showing an absence of any material factual issue for trial, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). *See Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 71 (2d Cir.1971).

Plaintiff has failed to demonstrate that, as of October 18, 1989, defendants were responsible for "an ongoing violation" of SDWA. In her statement of material facts not in dispute submitted pursuant to Rule 9(c)(1) of the Local Rules of Civil Procedure (D.Conn.), plaintiff claims it is not disputed that, *in 1986*, defendants found an annual average of combined radium–226 and radium–228 of 6.89 picocuries per litre (pCi/$l$)[2] in a sample taken from a blend of three wells. *See* Local Rule 9(c) Statement (filed May 30, 1990) at 8. In August 1989—two months before plaintiff filed suit in this case—an internal DHS memorandum indicated that "[t]he running average for the blended water from wells # 5, # 6 and # 7 for the period since the filters were installed in December 1988 is 4.45 pCi/$l$. This is within the standard for the sum of radium 226 and radium 228 which is 5.0 pCi/$l$." Defendants' Memorandum, Exhibit 10 (at-

tachment). This evidence is sufficient to raise a genuine issue about the existence of a fact material to plaintiff's case—that is, whether defendants were, in fact, permitting the quantities of chromium and radionuclides in their drinking water to exceed the maximum contaminant levels—and plaintiff's motion for partial summary judgment must be denied.

**B.** *Defendants' Cross–Motion for Summary Judgment*

. Defendants have cross-moved for summary judgment on all six counts of plaintiff's complaint. I shall consider the motion in four parts: First, the CERCLA claim (Count 1); second, the SDWA claim (Count 5); third, the RCRA claim (Count 6); and fourth, the pendent state claims (Counts 2–4).

1. CERCLA (Count 1)

a. *Is Plaintiff's Claim Barred by res judicata?*

Defendants argue that plaintiff's CERCLA claim is precluded by the doctrine of res judicata, because "plaintiff has already pursued a CERCLA claim and obtained a judgment on the merits" as a result of this court's Order Regarding Motion for Class Action Settlement (filed Sept. 7, 1989) in Civil Action No. H–88–48 (JAC). According to our Court of Appeals, "[t]he doctrine of claim preclusion holds that once a judgment has been rendered by a court of competent jurisdiction, it will be treated thereafter as the full measure of relief between the same parties on the same cause of action." *Bottini v. Sadore Management Corp.*, 764 F.2d 116, 119 (2d Cir.1985). In addition, "[t]he court in which the first action was brought must have been willing *and able* to consider the theory that is advanced in the second action." *Id.* (emphasis added).

The Supreme Court has recognized that "[c]ollateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the bur-

**2.** The maximum contaminant level for combined radium–226 and radium–228 in communi-

ty water systems is 5 pCi/$l$. *See* 40 C.F.R. § 141.15(a) (1990).

den of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979) (footnote omitted). It is undisputed that the defendants in this action (Civil Action No. H–89–667 (JAC)) were *not* parties to Civil Action No. H–88–48 (JAC), the class action which was settled in September 1989. This is not dispositive, however, for the law of collateral estoppel prohibits the relitigation of the same claims when the plaintiff received a "full and fair" opportunity to litigate her claims in the prior action, regardless of whether the defendants were parties to the prior action. *Id.* at 332–33, 99 S.Ct. at 652; *see also Collard v. Flower Hill,* 604 F.Supp. 1318, 1322 (E.D.N.Y.1984) (to invoke doctrine of collateral estoppel, "[i]t is not necessary that the parties be identical in both suits"), *aff'd on other grounds,* 759 F.2d 205 (2d Cir.), *cert. denied,* 474 U.S. 827, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985).

■ Although the doctrines of res judicata and collateral estoppel no longer require a strict identity of parties, they still require that the claims in the subsequent action be substantially identical to those litigated in the prior action. Plaintiff asserts that her "CERCLA claims in this action go to the recovery of response costs incurred *after* the class action settlement in [Civil Action No.] H–88–48 (JAC). Plaintiff incurred costs for conducting water tests and purchasing bottled water from September 1989 through February 1990." Plaintiff Marion Decesar's Memorandum in Reply and in Opposition to Defendants' Cross–Motion for Summary Judgment in H–89–667 (JAC) (filed Sept. 10, 1990) ("Plaintiff's Memorandum in Opposition") at 6 (emphasis in original). The settlement of the class action claims on September 7, 1989 could not preclude the litigation of claims for costs incurred *after* September 7, 1989. *See generally* F. James & G. Hazard, *Civil Procedure* § 11.16, at 618–19 (3d ed. 1985) ("Where issue preclusion is involved . . ., the one who claims its benefit (proponent) must show that the very fact or point now in issue was, in the former

action, (1) litigated by the parties; (2) determined by the tribunal; and (3) necessarily so determined.").

### b. *Does CERCLA Apply to Defendants?*

■ Defendants may qualify as "covered person[s]" under the liability provision of CERCLA in one of four ways: (1) They currently own and operate a vessel or a facility; (2) they owned or operated a facility at the time of disposal of any hazardous substance; (3) they arranged for disposal or treatment of hazardous substances owned or possessed by another party at any facility owned or operated by another party; or (4) they accept or accepted hazardous substances for transport to disposal or treatment facilities or sites which they selected from which a hazardous substance is released. 42 U.S.C. § 9607(a)(1)–(4) (1988).

Defendants argue that they do not own a "facility" within the meaning of CERCLA. A "facility" means "(A) any building, structure, installation, equipment, pipe or pipeline . . . well, pit, . . . or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; *but does not include any consumer product in consumer use or any vessel.*" 42 U.S.C. § 9601(9) (1988) (emphasis added). Defendants argue that "[t]he drinking water supplied to the Plaintiff is a good provided to Plaintiff in her home for her consumption and as such is a consumer product in consumer use." Defendants' Memorandum at 12–13.

It does not appear that any court in this Circuit has interpreted the meaning of the "consumer product" exception in CERCLA's definition of "facility." But guidance to its meaning may be found elsewhere. In *Dayton Indep. School Dist. v. U.S. Mineral Prods. Co.,* 906 F.2d 1059 (5th Cir.1990), the court considered whether Congress intended CERCLA to provide a right to recover the costs of removing asbestos from building materials. In that case, the defendants argued that the hazardous substance—asbestos—was added to the build-

ing material, a consumer product which is exempt from the definition of a "facility." *Id.* at 1065. The court found defendants' argument convincing:

> The provision exempting consumer products obviously was meant to protect from liability those who engage in production activities with a useful purpose, as opposed to those engaged in the disposal of hazardous substances. It is clear that Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products. Rather, taken in context, the provision reflects Congress' desire to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal.
>
> The legislative history reinforces appellants' argument that Congress intended to provide recovery only for releases or threatened releases from inactive and abandoned waste sites, not releases from useful consumer products in the structure of buildings.

*Id.* at 1065–66 (footnote omitted).

Similarly, in *Knox v. AC & S, Inc.*, 690 F.Supp. 752 (S.D.Ind.1988), the court found that insulation products containing asbestos, although "components of the ultimate product used by a consumer, a building," were nonetheless consumer products "to the extent that insulation is a commercial product, sold between businesses." *Id.* at 756.

In *Electric Power Bd. of Chattanooga v. Westinghouse Elec. Co.*, 716 F.Supp. 1069 (E.D.Tenn.1988), the court considered whether the use of toxic polychlorinated biphenyl ("PCB") fluid in electrical transformers fell within the scope of CERCLA. The plaintiffs in that case submitted evidence that the transformers were defective and that they leaked, releasing the hazardous substances into the environment. But the court concluded that the "Wagner transformers containing Monsanto dielectric fluid [were] consumer products in consumer use. The transformers were not, therefore, 'facilities.'" *Id.* at 1080.

Plaintiff attempts to distinguish her case from some of those discussed above by insisting that the "consumer products" exception in the statute applies only to cases where the hazardous substance is a "component part" of the consumer product and only when the hazardous substance is accidentally released from a properly functioning consumer product. *See* Plaintiff's Memorandum in Opposition at 17–18. While it is true that no case has specifically held that water containing hazardous substances is a "consumer product in consumer use," plaintiff's efforts to distinguish this case from the others only succeed in convincing me that the prior cases do not definitively dispose of the issues here.

CERCLA "was designed 'to bring order to the array of partly redundant, partly inadequate federal hazardous substances cleanup and compensation laws.'" *New York v. Shore Realty Corp*, 759 F.2d 1032, 1040 (2d Cir.1985) (quoting F. Anderson, D. Mandelker, & A. Tarlock, *Environmental Protection: Law and Policy* 568 (1984)). More specifically, the purpose of CERCLA was to "initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.Rep. 1016, 96th Cong., 2nd Sess., pt. 1, at 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6125. As the Court of Appeals for the Fifth Circuit stated in the *Dayton* case discussed above, "Congress intended to provide recovery only for releases or threatened releases from inactive and abandoned waste sites, not releases from useful consumer products in the structure of buildings." *Dayton*, 906 F.2d at 1066. Nor, presumably, did Congress intend to provide recovery under CERCLA for releases of hazardous materials found in useful consumer products such as drinking water.[3]

---

**3.** There is also the rather obvious point that given the prior existence of the Safe Drinking Water Act, the primary purpose of which is to protect the safety of drinking water, it would appear unlikely that Congress intended to regulate the provision of drinking water further through the indirect route of CERCLA.

In light of the reasoning of the other courts and of the congressional purpose in enacting CERCLA, I am persuaded that defendants are not the owners of a "facility" within the meaning of 42 U.S.C. § 9601(9). The chromium and radionuclides contained within the water—and not the water itself—are the "hazardous substances." Like the asbestos in building materials and the PCB fluid in transformers, the contaminants in this case are contained in a "consumer product in consumer use."

Despite the apparent plausibility of plaintiff's argument that defendants own and operate a "facility"—after all, they *do* own wells, pipes and equipment for supplying water to the residents of the park—CERCLA is simply not the appropriate legal instrument with which to challenge the conduct of the defendants in this case. Defendants were as much "victims" of the contamination of the soil and groundwater at the Hillside Industrial Park as was the plaintiff.[4] They have in no way caused or contributed to the release of the hazardous substances into the drinking water supply. There exists no genuine issue of material fact as to Count 1 of the Complaint, and therefore, defendants' motion for summary judgment on Count 1 is granted.

### 2. SDWA (Count 5)

■ As I noted above in considering plaintiff's motion for partial summary judgment on Count 5, there exists a genuine issue as to whether the levels of chromium and radionuclides exceeded the maximum contaminant levels at the time the Complaint was filed. For defendants to prevail on their cross-motion on this same count, I would need to find that this issue of contamination levels is irrelevant because defendants are entitled to prevail as a matter of law.

The citizen suit provision of SDWA permits "any person" to commence a civil action on his or her own behalf "against any person ... who is alleged to be in violation of any requirement prescribed by or under this subchapter." 42 U.S.C. § 300j–8(a)(1) (1988). The only conditions for commencement of such a civil action are that (1) sixty days before the commencement of the civil action, prior notice of the alleged violation be given to the Administrator of the EPA, to the alleged violator, and to the State in which the violation occurs; and (2) no governmental entity has "commenced and is diligently prosecuting a civil action in a court of the United States" to require compliance with such requirement. 42 U.S.C. § 300j–8(b) (1988). The parties do not dispute that both these conditions have been satisfied.

Defendants' principal argument is that because the federal EPA and the state DHS are "empowered to determine compliance with SDWA, Plaintiff, in order to establish a violation of the SDWA, must plead and prove that *the State* had determined that the High Manor Defendants were not in compliance. The facts belie such a conclusion in this case." Defendant's Memorandum at 21–22 (emphasis added). Plaintiff disagrees, arguing that the regulations governing the implementation of SDWA "make it clear that it is the 'supplier of water' and not the state who had the obligation to monitor the water supply." Plaintiff's Memorandum in Opposition at 23.

In order to interpret the requirements of the citizen suit provision of SDWA, it is useful to examine how courts have interpreted citizen suit provisions in environmental statutes that have received greater

---

**4.** It is worth noting that plaintiff's attorney—John L. Giulietti—was also a plaintiff in a related case, *James D. Giulietti and John L. Giulietti v. Warren J. Gottier and Precision Plating Corp.*, Civil No. H–88–53 (JAC), that was resolved in favor of defendants on summary judgment. *See* Ruling on Motions for Summary Judgment (filed Oct. 10, 1989). Defendants in this case state in their memorandum that Mr. Giulietti and his family "are the officers of a corporation which owns the only other mobile home park in the Town of Vernon ...," Defendants' Memorandum at 5, suggesting that he may have an ulterior motive in discrediting Mr. Van Ostrand and his company. While I have no reason to believe that this is relevant—let alone true—it does suggest that the relationship among the principals in this case is complicated and not entirely free of animus.

judicial attention. The structure of the citizen suit provisions in SDWA, RCRA, the Clean Water Act, 33 U.S.C. §§ 1251–1387 (1988) ("CWA"), and the Clean Air Act, 42 U.S.C. §§ 7401–7642 (1988) ("CAA") are essentially the same. *See Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 63 (2d Cir.1985) ("The Clean Water Act citizen suit provision is a 'clear parallel' of section 304 of the Clean Air Act. . . ."); *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 978 (2d Cir. 1984) (comparing citizen suit provisions of SDWA, RCRA, and CWA and concluding that they are substantially identical, differing principally "in the language used to describe the cases a private individual can initiate").

In *Friends of the Earth,* the Court of Appeals narrowly construed the scope of preclusion of citizen suits under CWA. The language "unambiguously and without qualification refers to an 'action in a court of the United States, or a State.' It would be inappropriate to expand this language to include administrative enforcement actions." *Friends of the Earth,* 768 F.2d at 62 (citation omitted). In construing this language, the Court of Appeals explicitly rejected the view of the Court of Appeals for the Third Circuit, which had held that a citizen suit could be precluded by an action already commenced before an administrative tribunal if that tribunal had "the power to accord relief which is the substantial equivalent to that available to the EPA in federal courts under the Clean Air Act." *Baughman v. Bradford Coal Co.,* 592 F.2d 215, 219 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). In other words, the Court of Appeals for the Second Circuit rejected this broader view of the scope of preclusion in favor of one that would interfere with citizen suits only when an action had already begun in a federal or state *court. See also Maryland Waste Coalition v. SCM Corp.,* 616 F.Supp. 1474, 1481 (D.Md.1985) (adopting Second Circuit's approach in *Friends of the Earth* ). *But see Brewer v. City of Bristol,* 577 F.Supp. 519, 527 (E.D.Tenn.1983) (while expressing "no opinion as to the effect of the *Baughman* holding in the Sixth Circuit," court adopted *Baughman* approach and determined that, in this particular case, administrative agency was not a "court").

In this case, neither the EPA nor the DHS had begun any action—either judicial or administrative—at the time of plaintiff's suit. Indeed, defendants' position is that both of these agencies had explicitly concluded that no enforcement action was warranted. I have found only one case that has considered the effect that an agency's decision not to prosecute would have on the ability of a citizen to bring suit. In *Student Pub. Interest Research Group, Inc. v. Georgia–Pacific Corp,* 615 F.Supp. 1419 (D.N.J.1985), the court wrote the following:

> Defendant's allegations as to the views expressed by EPA and DEP [New Jersey Department of Environmental Protection] concerning defendant's compliance with the [Clean Water] Act between 1980 and 1984 are irrelevant for purposes of assessing plaintiff's right to bring this lawsuit. Section 505(b)(1)(B) was intended to preclude citizen suits only when comparable action by an administrative agency is underway, *not whenever an agency sees fit to approve the actions of private parties subject to its jurisdiction.* Defendant's interpretation of the Act would render citizen suits impossible when they are required most: instances where an agency encourages a polluter to believe its unlawful behavior will go unpunished.

*Id.* at 1427 (emphasis added); *cf. Sierra Club v. Union Oil Co.,* 716 F.Supp. 429, 436 (N.D.Cal.1988) ("a citizen enforcement action may be maintained where the State [California Regional Water Quality Control Board] has known that a company was violating its permit, and has apparently acquiesced to these violations").

Defendants' argument would—if accepted—eviscerate the citizen's right to bring a civil action. The entire purpose of this right is to ensure that claims of violations may be considered by courts despite a decision by the government officials primarily responsible for the enforcement of the statute that there has been no violation. *See*

*Sierra Club*, 716 F.Supp. at 436 ("this is the purpose behind the citizen enforcement provisions of the Clean Water Act—to ensure that our environmental laws are enforced even where a state or the federal government have not been diligent in their roles"); *see also Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 700 (D.C.Cir.1975) (citizen suit provision "was designed to provide a procedure permitting any citizen to bring an action directly against polluters violating the performance standards and emission restrictions imposed under the law"). Defendants have offered evidence suggesting that the EPA and the DHS have already determined that defendants are not in violation of SDWA. *See* Defendants' Memorandum at 20 & Exhibit 8 (Letter dated July 27, 1989 from Gerald R. Iwan, Chief, Water Supplies Section, DHS, to Robert Hurley, Director, Professional Licensing Division, Department of Consumer Protection), Exhibit 9 (Letter dated August 8, 1989 from Gerald R. Iwan, Chief, Water Supplies Section, DHS, to John L. Giulietti, Plaintiff's Counsel), & Exhibit 15. But these are legal conclusions on which Congress—by enacting the citizen suit provisions—did not intend for government agencies to have the final word.

I intimate no view whatsoever on what is, finally, a question of fact; I am mindful of the deference usually paid to administrative expertise in technical matters such as these. The depositions and letters included as exhibits to Defendants' Memorandum are compelling, but there is nonetheless a serious disagreement about the precise level of contamination in defendants' water supply. A summary judgment motion is not the place to resolve that dispute. As our Court of Appeals has stated repeatedly, " 'on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983) (quoting *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)). For these reasons, defendants' motion for summary judgment on Count 5 of the Complaint must be denied.

### 3. RCRA (Count 6)

In Count 6 of her Complaint, plaintiff brings a citizen's suit pursuant to Section 7002 of RCRA, codified as amended at 42 U.S.C. § 6972(a)(1)(A), alleging that defendants are in violation of provisions requiring that "each person owning or operating an existing facility ... for the treatment, storage, or disposal of hazardous waste ... have a permit issued pursuant to this section," 42 U.S.C. § 6925(a) (1988).

In addition to challenging alleged violations of permit requirements, plaintiff alleges that defendants have "contributed ... to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (1988).

### a. *Can Plaintiff Simultaneously Bring Claims Under RCRA and under SDWA?*

■ Defendants rely on Section 1006(a) of RCRA, which states explicitly that "[n]othing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the ... Safe Drinking Water Act ... except to the extent that such application (or regulation) is not inconsistent with the requirements of [this] Act[ ]." 42 U.S.C. § 6905(a) (1988). They argue that

> [i]t is inherently inconsistent to seek the simultaneous regulation of a substance as a usable, desirable consumer good under SDWA and as a waste under RCRA. A substance cannot simultaneously be a waste and a consumer good and RCRA does not contemplate such an intrusion into the regulation of facilities already governed by SDWA.

Defendants' Memorandum at 25. Plaintiff disagrees, insisting that "[n]othing in the nature of these claims [failure to exercise due care, monitor, or notify under SDWA] stands 'inconsistent' to [sic] plaintiff's further allegations that the defendants violated RCRA by unlawfully treating, trans-

**1154**

porting, storing, and disposing of the hazardous contaminants." Plaintiff's Memorandum in Opposition at 33.

Defendants' arguments concerning the *inherent* inconsistency of applying RCRA to activities already regulated by SDWA are not convincing. While SDWA applies to the safety of the drinking water, RCRA is concerned with the safe treatment and disposal of hazardous substances—hazardous substances that could be contained within the drinking water. Section 1006(b) of RCRA specifically contemplates the integration of RCRA's provisions with those of SDWA "to the extent that it can be done in a manner consistent with the goals and policies expressed" in both. *See* 42 U.S.C. § 6905(b) (1988). I find no inherent inconsistency between plaintiff's SDWA and RCRA claims, and Section 1006 of RCRA would not preclude the simultaneous consideration of both.

b. *Does RCRA Apply to Defendants?*

1. Are Defendants Subject to RCRA Permit Requirements?

■ In order to be subject to the permit requirements of RCRA, defendants would have to be deemed persons "owning or operating a facility for the treatment, storage, or disposal of hazardous waste," 42 U.S.C. § 6925(a) (1988). Congress chose not to define the term "facility" in RCRA, leaving that task instead to the EPA Administrator. In regulations adopted pursuant to RCRA, "facility" is defined as "all contiguous land, and structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste. A facility may consist of several treatment, storage, or disposal operational units (e.g., one or more landfills, surface impoundments, or combi-

nations of them)." 40 C.F.R. § 260.10 (1989).

It is clear from the context of the regulation—as well as from its plain language—that neither Congress nor the EPA Administrator intended that a system of wells, pipes, and distribution tanks designed for the purpose of delivering drinking water to private citizens would be considered a "facility" within the meaning of RCRA. Examples of facilities commonly regulated pursuant to RCRA—including landfills, waste piles, thermal treatment units, incinerators, and hazardous waste tanks, *see* 1 S. Cooke, *The Law of Hazardous Waste* § 5.02[3] at 5–25 to –26 (1990)—suggest that the object of RCRA's regulations are those facilities designed explicitly for the purpose of treating, storing, or disposing of hazardous wastes. Even assuming for the argument only that the defendants' blending of the waters from various wells constitutes "treatment" of hazardous waste,[5] the distribution tanks in which this blending occurs are not "facilities" within the meaning of RCRA.

2. Do the Levels of Chromium Represent an "Imminent and Substantial Endangerment to Health or the Environment"?

■ Plaintiff's second claim in her citizen's suit under RCRA is that defendants have "contributed or ... [are] contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972 (1988). Plaintiffs have failed, however, to present any evidence that, in this case, the chromium in the

---

**5.** Treatment is defined as "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, ... or so as to render such waste non-hazardous ..." 40 C.F.R. § 260.10 (1989). Dilution is explicitly excluded as a viable form of treatment. *See* 40 C.F.R. § 268.3 (1989) (no "owner or operator of a treatment, storage, or disposal facility shall in any way dilute a restricted waste ... as a substitute for adequate treatment to achieve compli-

ance" with applicable regulations). Plaintiff suggests that because defendants "blended" the waters from various wells, they were practicing "dilution" in violation of proper treatment procedures. *See* Letter from John L. Giulietti to Judge José A. Cabranes (filed Sept. 21, 1990) at 2. Plaintiff has failed, however, to demonstrate that defendants are "owner[s] or operator[s] of a treatment ... facility" for whom any such arguable dilution would be impermissible under 40 C.F.R. § 268.3.

water presents an "imminent and substantial endangerment to health or the environment." Defendants, on the other hand, have included several letters as exhibits in which officials of the DHS assert that the water is "safe for consumption." Defendants' Memorandum, Exhibit 6 (Letter of Sept. 28, 1988 from Steve Klobukowski, Senior Sanitary Engineer, DHS, to George Van Ostrand) at 2; *see also* Exhibit 5 (Letter of Oct. 5, 1987 from Naomi Davidson, Senior Environmental Analyst, DHS, to Residents of Park) ("the water supply at High Manor Mobile Home Park has been and currently is a safe drinking water supply").

For reasons already presented above in the context of the SDWA count, these statements by DHS do not insulate the defendants from a citizen's suit. But in the absence of any suggestion beyond the mere allegation of "imminent and substantial endangerment," I find that there is no genuine issue as to whether the alleged harm posed by the "hazardous waste" in the drinking water is "imminent and substantial." Accordingly, defendants' motion for summary judgment as to Count 6 of the Complaint is granted.

### 4. Pendent State Law Claims (Counts 2–4)

Under the doctrine of pendent jurisdiction presented in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), a federal court has the power to assume jurisdiction over state law claims when both the "state and federal claims ... derive from a common nucleus of operative fact," *id.* at 725, 86 S.Ct. at 1138. However, the power to exercise jurisdiction "need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726, 86 S.Ct. at 1139.

In light of my decision to deny defendants' motion for summary judgment as to the SDWA claim in Count 5 of plaintiff's complaint, a federal cause of action remains. Under the *Gibbs* rule, pendent jur-

isdiction exists. Because the state law claims of private nuisance, public nuisance, and battery do not predominate over the federal issues, *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139, and because they are not particularly "delicate," *Falls Riverway Realty, Inc. v. City of Niagara Falls*, 732 F.2d 38, 42 (2d Cir.1984), the balance of relevant factors—particularly "the likelihood of a [relatively] prompt disposition in this long-delayed litigation," *id.*—favors the exercise of pendent jurisdiction in this case.

#### a. *Private Nuisance*

To establish a claim of private nuisance under Connecticut law, plaintiff must prove: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was a proximate cause of the plaintiff['s] injuries and damages." *State v. Tippetts–Abbett–McCarthy–Stratton*, 204 Conn. 177, 183, 527 A.2d 688, 692 (1987); *Filisko v. Bridgeport Hydraulic Co.*, 176 Conn. 33, 35–36, 404 A.2d 889, 891 (1978).

It is clear that, as a matter of law, defendants cannot be liable under the theory of private nuisance. "The term nuisance refers to the condition that exists and not to the act or failure to act that creates it." *Quinnett v. Newman*, 213 Conn. 343, 348, 568 A.2d 786, 789 (1990). If the existence of contaminants in the defendants' drinking water is a nuisance, the proximate cause of the nuisance was the chromium leakage at Precision. Even if plaintiff's allegations that defendants improperly tested the water and failed to give adequate notice are true, she would not have proved liability for nuisance. Defendants' motion for summary judgment with respect to Count 2 is granted.

#### b. *Public Nuisance*

Under Connecticut law, in order to state a claim for public nuisance, a plaintiff must not only be able to prove the four elements constituting a private nuisance but also "that the condition or conduct com-

plained of interfered with a right common to the general public." *Doe v. Manheimer*, 212 Conn. 748, 755 n. 4, 563 A.2d 699, 703 n. 4 (1989); *Tippetts–Abbett–McCarthy–Stratton*, 204 Conn. at 183, 527 A.2d at 692; *Higgins v. Connecticut Light & Power Co.*, 129 Conn. 606, 611, 30 A.2d 388, 391 (1943). Inasmuch as plaintiff's claim for private nuisance fails, so does her claim under a theory of public nuisance.

■ In addition, a nuisance is "public" only if it "interfere[s] with those who come in contact with it in the exercise of a public right." W. Prosser & W. Keeton, *Torts* § 90, at 645 (5th ed. 1984). Plaintiff has failed to demonstrate that drinking water from the defendants' water system is a right held by the general public. Assuming for the argument that defendants could be held responsible for creating a nuisance—a conclusion that no reasonable interpretation of the actual facts would support—their responsibility would be limited to the residents of the Park. The public does not have a right to drink from High Manor's water supply—it is a property right belonging solely to the residents alone. Defendants' motion for summary judgment with respect to Count 3 is granted.

### c. *Battery*

■ In Count 4 of the Complaint, plaintiff alleges that "the defendant(s) committed a battery on the plaintiff, in that her consent to turn on the water tap in her mobile home was negated by defendant[s'] fraud, specifically the defendant[s'] failure to warn her and other water users in High Manor Park as required by 42 USC Section 300(g)(3)(c) [notification requirement of noncompliance with applicable regulations under SDWA]. . . ." It is now clear that plaintiff has failed even to state a claim for battery sufficient to survive a motion to dismiss; she certainly will not survive a motion for summary judgment.

A person is subject to liability to another for battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Restatement (Second) of Torts* § 13, at 25 (1965). Even if the presence of contaminants in plaintiff's drinking water could be characterized as a "harmful contact," there is no evidence to suggest that defendants intended to cause this harmful or offensive contact.

Finally, a simple failure to test or to notify is not conduct sufficient to give rise to a claim for battery. The venerable tort rule that "in order to be liable for battery, the defendant must have done some positive and affirmative act," W. Prosser & W. Keeton, *supra*, § 9, at 41, remains good law. Defendants' motion for summary judgment on Count 4 is granted.

### C. *Motion to Reopen Discovery*

■ In light of the importance to the remaining issues in this case of the precise level of contamination at the time this lawsuit was filed and in light of the fact that plaintiff only became aware of the July 12, 1990 letter sent by Mr. Larson to Mr. Ritsick well after the completion date for discovery, it would be reasonable to allow plaintiff the opportunity to depose both Mr. Larson and Mr. Ritsick. For these reasons, plaintiff's request to depose Mr. Larson and Mr. Ritsick limited to questions concerning the July 12, 1990 letter is granted. Furthermore, plaintiff's request for production of documents related to the July 12, 1990 letter is also granted. Finally, absent any showing of bad faith or misconduct by the defendants, plaintiff's request for costs in conducting these depositions is denied.

### IV. CONCLUSION

For the reasons presented above, Plaintiff's Motion for Partial Summary Judgment and Other Relief (filed May 30, 1990) is DENIED; Defendants' Cross–Motion for Summary Judgment (filed Aug. 10, 1990) is GRANTED in part and DENIED in part, leaving only Count 5 (the SDWA Count) of plaintiff's Complaint open for trial; and Plaintiff's Motion to Reopen Discovery for a Limited Purpose in H–89–667 (JAC) and to Assess Costs Against Defendants (filed

Sept. 12, 1990) is GRANTED in part and DENIED in part.

It is so ordered.